# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
May 7, 2002 Session

## STATE OF TENNESSEE v. RONALD SIMMONS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-04708     James C. Beasley, Jr., Judge**

---

**No. W2001-02352-CCA-R3-CD  - Filed August 27, 2002**

---

The defendant pled guilty to sexual battery, a Class E felony, in exchange for a two-year sentence. The trial court sentenced the defendant to ninety days of weekend confinement, suspended the balance of the two-year sentence, and placed the defendant on probation for four years. The defendant appeals his sentence, arguing that the trial court erred in denying his petition for judicial diversion and in sentencing him to ninety days of confinement. After a review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Robert M. Brannon, Jr., Memphis, Tennessee, for the appellant, Ronald Simmons.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; William L. Gibbons, District Attorney General; and Linda Kirklen Dycus, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Ronald Simmons, was indicted on May 2, 2000, for aggravated sexual battery, a Class B felony, for his November 20, 1999, sexual contact with the ten-year-old victim, C.C.[1]  On March 5, 2001, the defendant entered a best interest guilty plea under North Carolina v. Alford[2] to sexual battery, a Class E felony. The defendant subsequently filed a petition for judicial

---

[1]It is the policy of this court to identify victims of sexual abuse by their initials only.

[2]
In North Carolina v. Alford, 400 U.S. 25, 37, 91 S. Ct. 160, 167, 27 L. Ed. 2d 162, 171 (1970), the United States Supreme Court held that a defendant may enter a guilty plea while claiming his innocence if the "defendant
(continued...)

diversion. On September 5, 2001, the trial court denied this petition, sentenced the defendant as a Range I, standard offender, imposed a two-year sentence suspended to ninety days of weekend service in the Shelby County Correctional Center, and placed the defendant on probation for four years. The defendant then filed a timely notice of appeal, raising two issues: whether the trial court erred (1) in denying his petition for judicial diversion, and (2) in sentencing him to ninety days of confinement before placing him on probation. We affirm the judgment of the trial court.

## FACTS

At the guilty plea hearing, the State informed the court that if this case went to trial, it would show the following: (1) on Saturday, November 20, 1999, the defendant brought the victim to his house so she could play games on his computer, (2) while the victim was playing on the computer, the defendant placed the victim on his lap and "put his hand underneath her shirt and rubbed her breast," and (3) a short time later, the defendant again placed the victim on his lap and "put his hand beneath her pants, inside her underwear and rubbed on her vaginal area with his finger."

At the sentencing hearing, the defendant testified that he was living with his wife, his two daughters, ages 19 and 17, his son, age 11, and his two-year-old grandson. His family had lived in the same house in Memphis since 1986 or 1987, and he financially supported his entire family. The defendant said that he joined the Air Force when he was 19 and served for two years before transferring to the Air National Guard. He had recently retired from the Air National Guard after serving for twenty-four years, attaining the rank of E-7, Master Sergeant. He was currently employed at a local business doing data entry and database management.

The defendant expressed his desire to be placed on judicial diversion, saying it would enable him to continue to support his family, and that he would not have a problem adhering to any conditions associated with diversion. He said that he had never been in trouble with the police before this incident, and he had not had any offenses in the two years since.

The defendant testified that he had complied with the trial court's order to obtain a psychological evaluation. He said that he met with Dr. John Robert Hutson a few times, took various tests, and had been candid with Dr. Hutson during their meetings. He had read Dr. Hutson's report, which concluded that he was a low risk for repeat offending.

The defendant explained why he entered his best-interest plea under Alford:

> At the time of the trial I was still a couple of months away from being eligible for retirement in the Air National Guard. So if I had went [sic] to trial and it had went [sic] against me, I would have

---

[2](...continued)

intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt."

been, of course, sentenced to a minimum of eight years and I would have lost my retirement and my family wouldn't of [sic] had any source of income, whatsoever.

The defendant said that the Air National Guard told him that he would be immediately terminated if he were convicted, and that a conviction would have resulted in his termination from the Guard anyway, since confinement would have made him unable to report to his Guard duty station.

During cross-examination, the defendant denied ever touching the victim in an inappropriate manner. On the day in question, the victim called and asked him if she could come over to his house and play on the computer because the computer at her house was locked in her parents' bedroom. The defendant's wife was babysitting the victim and her siblings at the victim's home that day, and he and his wife discussed the matter before he picked up the victim. He said that he was never alone in his home with the victim because his son and a friend were in the house playing video games that afternoon.

After the defendant picked the victim up from her house and took her to his house, he said that she played a computer game called "Jazz Jackrabbit" and then watched the movie "Hocus Pocus" on television with him. The defendant said his son then asked if he could go visit Paul Stott's son, and he took the victim home. After he dropped the victim off at her house, she played with some children with whom she was not supposed to associate, and his wife scolded her. The defendant said that one of these children had previously exposed himself to the victim.

The State asked the defendant to explain why the victim would invent this story:

> Q.    Why do you think [the victim] would make this up?
>
> A.    I don't know.
>
> Q.    You have no explanation for that?
>
> A.    No, I do not.
>
> Q.    Did she dis-like [sic] you?
>
> A.    I didn't think she did.
>
> Q.    Did y'all have an argument that day?
>
> A.    No.
>
> Q.    Did you punish her in any way?

A.      No, I didn't.

Q.      Or deny her time on the computer, or any other things like that, that would make her angry?

A.      I left her alone on the computer to do whatever.

Q.      So what you're telling the Court today is she just went home and told her mother that you touched her breast and her vaginal area?

A.      Well, she didn't go home and tell her mother. It was later that evening, or that night that she had told her mother. And this was, like, early in the day, so she was at home all day long, with my wife and other kids and stuff like that, before she said anything to anybody, or said it to her mother, that night.

Q.      But her mother was not present, though; isn't that correct?

A.      Yeah, she worked until sometime in the evening.

Q.      Right. So when she came home then that's when [the victim] told her?

A.      I suppose, yes.

Several of the defendant's friends and fellow Air National Guard members testified that the defendant is a dedicated, hardworking, trustworthy, and civic-minded individual. They each stated that they believed the defendant would have no problem following any conditions of judicial diversion. However, they all admitted that they did not know the victim and were not present the day of the alleged incident. Chris Allen Tackett testified that he had known the defendant for about sixteen years in the National Guard and that he believed him to be an honest and trustworthy person. Tackett stated that if he "felt like [the defendant] was guilty [he] wouldn't have been here" to testify. James Daniel Gallagher, the defendant's friend and a fellow member of the Air National Guard, testified that the defendant is "practically [his] best friend, if not [his] best friend." Gallagher stated that the defendant lived with his family after the defendant first got married and that the defendant had been around his daughter many times as she was growing up. Gallagher did not believe the accusations against the defendant were true. He described the defendant as "a soul brother" and did not believe the defendant was "capable of doing such things." Paul Stott testified that he and the defendant had been close friends for about ten years. Stott testified that he had always trusted the defendant with his young children. He said that the defendant and his son came to his home on the afternoon in question and that the defendant did not act unusual. Stott acknowledged that the

defendant was having marital problems during this period.  He also said that he believed that the defendant would have told him if he had molested the victim in this case.

The victim testified that the defendant's wife, Kathy Simmons, was babysitting her and her brother and sister on November 20, 1999, at the victim's home.  She said the Simmons's son called and told Mrs. Simmons that he was ready to go home from a friend's house.  Mrs. Simmons called the defendant and, while they were talking on the phone, the victim asked if she could go to the Simmons's residence to play on the computer.  The defendant picked her up at her house and took her to his house.  When she arrived at the defendant's house, she immediately went to the dining room where the computer was located and played a "rabbit" game on the computer.  The defendant sat "two steps" behind her while she played the game.  When she "got up for a minute," the defendant left his seat and sat down in her chair.  The defendant "hit his hand on his knees," indicating to her to sit in his lap.  He then reached over, put his hand inside her shirt, and rubbed her breast.  She described her reaction to this touching:

> I got up, because I was real scared and I was tired of playing on the computer.  So I went down and I sat on the – well, he had got up first and sat down on the couch.  So then, I was tired of playing on the computer so I went over and sat on the couch on the other side from him.

The victim said that they watched "Little Women," not "Hocus Pocus," on television for a few minutes before the defendant picked her up and put her on his lap on the couch:

> Q.     You weren't afraid at that point?
>
> A.     Well, I was scared, at first, but I didn't figure he was going to do anything else to me.
>
> Q.     Now, what happened after that?
>
> . . . .
>
> A.     Then he reached down into my pants and started rubbing my private.

The victim said that the defendant also licked her neck and asked, "Did that feel good?"  The victim said the defendant stopped touching her when he heard a door slam or a car drive by fast.  He picked her up, threw her on the couch "a little bit," ran to the door, and looked out the window.  At that point, the victim told him she wanted to go home.  The victim denied that the defendant's son or his friend were in the house when the defendant touched her.  She said she and the defendant were alone in the house.  She said that it was only after they picked up the defendant's son and all three went to get ice cream that the defendant finally took her home.  The victim testified that she did not tell

Mrs. Simmons what had happened when she arrived home because she was "scared [Mrs. Simmons] would say that that wasn't true . . . and get all mad at [her]." As soon as her mother got home from work and Mrs. Simmons had left, the victim told her mother that the defendant had touched her.

During cross-examination, the victim admitted that although she knew her mother's number at work, she did not call her to tell her what had happened at the defendant's house. Instead, she said she went outside to play and waited until her mother came home from work.

On redirect, the victim said she remembered the defendant licking her neck only after she had talked to the prosecutor several times. The victim stated, "I was remembering and I was on a good roll right then, and I remembered [the licking incident] and I told [the prosecutor]."

In response to the court's questions about this incident, the victim stated that this was the only time the defendant touched her inappropriately.

The victim's mother testified that, since the incident, the victim had gained weight, become depressed, and let her grades fall. She said that the victim had nightmares for a period of time after the incident. She asked the court to deny the defendant's request for diversion and to sentence him to jail. The victim's stepfather, who adopted the victim at an early age, testified that he believed that the defendant should serve some time in jail and should have this "on his record for the rest of his life." He said that the victim still has nightmares and has suffered emotionally.

Kelly Grisham, the education and training coordinator at the Child Advocacy Center, testified that she maintains records on the number of child abuse cases reported in Shelby County each year. She explained that the Child Advocacy Center is notified of child abuse cases as they are reported to the Memphis Police Department, the outlying law enforcement authorities, and the Department of Children's Services. The Center, in turn, is required to report this information to federal and state agencies on a regular basis.

Grisham testified that if cases meet specific criteria, then they are designated as Child Protection and Investigation Team ("C.P.I.T.") cases.[3] These C.P.I.T. cases include child abuse cases of a physical or sexual nature. Grisham stated that there were 1,360 C.P.I.T. cases reported in Shelby County in 1999 and 2,081 in 2000. In 2001, 425 C.P.I.T. cases had been reported year to date in Shelby County.[4] Grisham stated that 75% of the total number of child abuse cases reported each year in Shelby County were sexual abuse cases. On cross-examination, Grisham admitted that she did not know how many of these reported cases resulted in indictments or convictions.

---

[3]Although Kelly Grisham's testimony did not include a detailed description of the criteria for C.P.I.T. cases, the transcript indicates that the case at hand was classified as a C.P.I.T. case.

[4]This figure represents the number of C.P.I.T. cases reported in the first month of the 2001 fiscal year, which runs from June 2001 to May of 2002. Grisham testified at the sentencing hearing on September 5, 2001, and she explained that the numbers of reported child abuse cases for July and August 2001 were not yet available.

Dr. John Robert Hutson, a clinical psychologist, testified that he evaluated the defendant for the sentencing hearing. Based on several tests, including two recommended by the Tennessee Department of Correction, Dr. Hutson concluded that the defendant was a low risk for repeat offending and that he was an excellent candidate for probation and/or diversion.

At the conclusion of the sentencing hearing, the trial court determined the defendant's sentence and set out its reasoning:

> Let me preface my remarks by saying that decisions in these kinds of cases are never easy. I don't know the answers and I don't know all the solutions. But, I do know under the law that I have certain obligations and I'm going to try to comply with those obligations as I understand the law to be written.
>
> I'm going to attempt to address the issues that I think are supposed to be addressed under the law, to the best of my ability, to voice it and to speak it.
>
> Because of the offense for which [the defendant] has been convicted is a class "E" felony, there is a presumptive entitlement to probation. An entitlement does not mean that [the defendant] automatically gets probation, it means that there is a presumption of an entitlement to probation.
>
> The presumption can be overcome by competent proof. The factors that I think need to be considered in this particular case, obviously, [the defendant] has no prior criminal history. There's no indication of prior, previous actions, or character of the defendant that are flawed, or in any way, inappropriate.
>
> In fact, with the material that's been presented to the Court, [the defendant] has, what would appear on the surface and on paper, to be, an impeccable background. A long history of service to the country. Dedication to one particular position in job. No arrests. No prior criminal history. Until we reach this particular incident.
>
> Under those circumstances would it be normal, or appropriate to consider [the defendant] as an individual who could reasonably be expected to be rehabilitated? I don't think there's any answer but yes to that question, based upon the history.

Would [the defendant] be an individual who could abide by the terms of probation, if imposed? It would appear from his background that he would.

Have there ever been alternatives to confinement attempted with [the defendant]? Well, he's never been arrested, so there is none. The answer to that would be no, there's never been any other alternative put forth for [the defendant].

Then we get to the facts and circumstances of the offense. In listening to the testimony and reviewing the documents that have been presented to me during the course of this hearing, one thing that stands out in my mind, that is very difficult for me to overcome, frankly, I have a ten year old child who makes an allegation of a sexual offense that's been committed against her. I have no indication that the child has been an inappropriate child; has a history of problems; has a history of lying; has a history of wild and vivid imagination. I have nothing more, frankly, than a normal, typical, ten year old child, who makes an allegation against a man who has no prior history and no prior record and no prior indication of being a sexual offender.

So the question, then, becomes why. Why would a ten year old child, and frankly it's kind of hard to keep in mind that what I have before me now is a maturing, taken in context, twelve year old child, versus the alleged victim at the time of the offense was a ten year old child.

Why would a child make an allegation, such as the one we have here today, against a man that, by all accounts, has been with his family, an active part of her life for – I never did get it straight, but eight, nine months to a year. And it appears from as best I can recall the testimony that the Simmons family baby-sat for these children, two to three times, or more, a week, for that period of time.

No animosity. No allegations of inappropriate behavior. No indications from the children that the Simmons were ugly to them, or that there was a problem, or that they were not good baby-sitters. To the contrary. Everything was good, based on the testimony that I've heard. No reason for such an allegation to be made.

Frankly, some innuendoes which I don't know the basis for the innuendo, but some innuendo. But, even considering the

innuendo, the thing that I can't get out of my mind is, why, if it's a made up story, why pick the individual who would, at least, seem to be close to your family as the perpetrator. Why not pick the ugly neighbor down the street? Why not pick the mean guy next door? Why not pick the teacher that you don't like at school? Why pick an individual who's [sic] children have been baby-sitting you, who's [sic] wife has been baby-sitting you, who's apparently interacted with you. Who's apparently caused no problems, had no problems, no indication of any kind of animosity. Why pick that person to make these allegations against? That just doesn't make sense to me.

And I understand children often do things and say things and get themselves in a position that it's hard to get themselves out of. I understand that. But, I don't know too many children that tell lies to get themselves into trouble. And it just does not seem to fit in this case. It doesn't make any sense to me that this little girl would make this up.

So, we have a situation where an allegation has been made. If the allegation[] is true, [the defendant] is not entitled to probation. But, because of the nature of, whether it be the case, whether it be our system, whether it be any number of factors. The ability of [defense counsel] to negotiate, I don't know. But, [the defendant] pled guilty to a lessor offense, a class "E" felony, sexual battery, which by law there is a presumptive right to probation.

The enormity of the offense, in my mind is great. The depravation of a ten year old['s] innocence, in my mind, is a great harm. That is something, in my mind, that once lost is probably never recoverable. I'd like to think that it can be, but I don't know.

Following the guidelines of the statute, 40-35-303, probation consideration and case law considerations the Court has considered the facts and circumstances surrounding this offense, which I have stated.

Obviously, [the defendant] has no prior history. His actions and character appear to be good, with the exception of this incident.

Could we reasonabl[y] expect, based upon his prior history that he would be rehabilitated? I see no reason to doubt that.

Would he abide by the terms set by this Court? I see no reason to doubt that.

The interest of society and being protected from possible future criminal conduct of the defendant. It would appear to me, based on the testimony of Dr. Hutson, based upon the background of [the defendant], based upon the testimony of his friends and acquaintances, that [the defendant] would be an individual that if he did make a mistake, is capable from learning from that mistake and would not be the kind of individual, based on even the cold, calculated, statistical facts that we're asked to consider. Would not be an individual that would be likely, in this case, to commit this type of an offense, again.

So I would think that the interest of society and being protected from possible, future criminal conduct that the defendant could comfortably rest assured that we would not have [the defendant] to deal with, again.

Is confinement necessary to avoid depreciating the seriousness of the offense? And also, is confinement particularly suited to provide an effective deterrence to others likely to commit similar offenses[?]

Those are the two cases at issue that I'm struggling with.

I can't get around the facts of the particular case. It is the opinion of the Court that diversion in this particular case, based upon the nature of the case, the facts of the case, the serious allegations involved in the case and I understand that it has been pled down to an "E" felony. But, the allegations involved in this would constitute a – I believe it's a "B" felony, which indicates that the legislature has seen fit to make the allegations of this particular type of a crime, a serious offense. And it would appear to this Court that diversion, under those circumstances of the facts of the case, the emotional effect and impact that this has had on the victim. The fact that diversion, in my mind, would completely depreciate the serious nature of this offense. I am of the opinion that diversion is not appropriate for this crime and for this offense.

I do not feel, however, that complete confinement is necessary in this particular case, based upon [the defendant's] background and his history. I do feel he is a worthy candidate for probation.

I feel that some confinement is necessary to avoid depreciating the serious nature of this offense and also to provide an effective deterrence to others likely to commit similar types of offenses.

It's apparent from the proof that's been presented that sexual abuse of children is a problem in our community. It is a crime that does not usually involve witnesses. It is usually a crime that does not involve a lot of evidence. It's usually a crime involving adults [sic] word against the child's word. And it would appear to me that if word is not sent out that if the proof is sustained that anybody that commits this type of an offense should be confined.

It would not be an effective deterrence to others to place [the defendant] completely on probation.

I'm going to do this. I'm going to require [the defendant] to serve 90 days at the Shelby County Correctional Center. In light of his history and in light of the fact that he is presently employed I will consider allowing him to serve that sentence on weekends.

He will be on probation for a period of 4 years. I will require, as a condition of probation, pursuant to statute, sexual offender treatment program and that will be the only special condition that I'll put.

## ANALYSIS

In his appeal, the defendant argues that the trial court erred in denying his petition for judicial diversion and in sentencing him to ninety days of confinement before placing him on probation. The State responds that the record adequately supports the trial court's decision to deny diversion and that the defendant has failed to show that the court's imposition of ninety days of confinement is improper.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871

S.W.2d 163, 166 (Tenn. Crim. App. 1993). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

Since the defendant challenges his sentence, he has the burden of proving that his sentence was erroneous. See Tenn. Code Ann. § 40-35-401 (1997), Sentencing Commission Cmts.; see also Ashby, 823 S.W.2d at 169; Butler, 900 S.W.2d at 311. This court must consider the following factors when conducting a *de novo* review of a sentence: (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

## I. Denial of Judicial Diversion

The defendant argues that the trial court erred in denying his petition for judicial diversion, saying that although the trial court mentioned various factors in support of diversion, it failed to actually weigh these factors. The trial court's emphasis on the alleged offense, he argues, effectively prevented him from ever being considered for diversion. See State v. Markham, 755 S.W.2d 850, 853 (Tenn. Crim. App. 1988) ("Denial of diversion based only on the essential elements of a crime, without judicially weighing all relevant factors, effectively excludes persons charged with that crime from consideration for pretrial diversion. Only the legislature has that prerogative.")

Second, the defendant argues that even if the trial court properly considered all of the appropriate factors, the record does not support a denial of judicial diversion. In support of his argument, the defendant emphasizes the following facts: he supports his entire family; he served his country for twenty-four years in the Air Force and the Air National Guard; he has no criminal record; his friends and coworkers testified that they did not believe he was capable of committing this crime; and Dr. Hutson testified that he was a low risk to repeat offend and a good candidate for probation and/or diversion. The defendant also points out several problems with the victim's testimony: the victim requested to come to his residence to play games on the computer; the victim chose to sit on the couch next to the defendant after the alleged inappropriate touching occurred; the victim failed to run away from the defendant or call her mother once she arrived home; and the victim failed to tell the police about the defendant licking her neck. The defendant argues that the record lacks any significant evidence to support the denial of diversion.

The judicial diversion statute provides that following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified, consenting defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A) (Supp. 2001). According to this statute, a qualified defendant is one who:

(a) Is found guilty of or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought;

(b) Is not seeking deferral of further proceedings for a sexual offense or a Class A or Class B felony; and

(c) Has not previously been convicted of a felony or a Class A misdemeanor.

Tenn. Code Ann. § 40-35-313(a)(1)(B)(i) (Supp. 2001). If the defendant successfully completes his period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. Tenn. Code Ann. § 40-35-313(a)(2), (b) (Supp. 2001).

The decision to grant or deny a qualified defendant judicial diversion lies within the sound discretion of the trial court. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997); State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1 (Tenn. 2000). As such, it will not be disturbed on appeal absent an abuse of discretion. Electroplating, 990 S.W.2d at 229; Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168. To constitute an abuse of discretion, the record must be devoid of any substantial evidence in support of the trial court's decision. Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168; State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

In determining whether to grant diversion, the trial court considers the following: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. Electroplating, 990 S.W.2d at 229; Bonestel, 871 S.W.2d at 168. A trial court should not deny judicial diversion without explaining the factors in support of its denial, and how those factors outweigh other factors in favor of diversion. Id.

It is apparent from the record that the trial court considered all factors relevant to judicial diversion, including the lengthy and thorough presentation on behalf of the defendant. However, the factors favoring diversion, in the view of the trial court, were outweighed by the victim's testimony that the defendant touched her breast and rubbed her vaginal area; the subsequent effect of these touchings on the victim; and the belief that diversion would not deter others but would depreciate the seriousness of the offense. As we have discussed in our analysis, we review this ruling to determine whether the trial court abused its discretion in denying diversion; and, to find abuse of discretion, we must determine that no substantial evidence exists to support the ruling of the trial court. Here, although there were numerous factors favoring judicial diversion, the trial court determined that these were outweighed by the factors, enumerated by the court, against diversion. The evidence presented in this matter was such that the trial court would have acted within its

discretionary authority had it granted judicial diversion. However, we conclude that there is substantial evidence in the record supporting the reasons enumerated by the trial court for denying diversion, and, thus, that the court did not err in doing so.

## II. Imposition of Ninety Days of Confinement

The defendant argues that his entry of an Alford plea to the Class E felony of sexual battery raises a presumption that he should be entitled to probation, which the State has failed to overcome. To buttress this claim, he points to the testimony of Chris Tackett, Paul Stott, and James Daniel Gallagher concerning his good character, dedication to his work, and unblemished past. He also focuses on the testimony of Dr. Hutson, a witness for the State, who concluded that the defendant was a low risk to repeat offend and a good candidate for probation. In addition, the defendant claims the State's evidence concerning sexual abuse in Shelby County is incomplete and cites the same weaknesses in the victim's testimony. Given this evidence, the defendant argues that the State has failed to rebut the presumption of probation. However, the State argues that the need for deterrence, the facts of the offense, and the defendant's lack of candor support the trial court's decision to impose ninety days of confinement rather than full probation.

It appearing that the trial court considered the sentencing principles and all relevant facts and circumstances, our review of this issue is *de novo* with a presumption of correctness.

The Tennessee Criminal Sentencing Reform Act of 1989 encourages trial courts to use alternatives to confinement when sentencing defendants. See Tenn. Code Ann. § 40-35-102(3)(C) (1997); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). According to Tennessee Code Annotated section 40-35-102(6), "an especially mitigated or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6) (1997).

Even if a defendant is eligible for probation, he or she is not automatically entitled to probation as a matter of law. See Tenn. Code Ann. § 40-35-303(b) (1997). The burden is upon the defendant to show that he is a suitable candidate for probation. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996); see Tenn. Code Ann. § 40-35-303(b) (1997). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. Another appropriate factor for a trial court to consider in determining whether to grant probation is

a defendant's credibility or lack thereof, as this reflects on the defendant's potential for rehabilitation. Id. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456.

As a preliminary matter, we note that the trial court allowed weekend service of the ninety-day sentence so that the defendant could continue to support his family. As previously mentioned, the trial court acknowledged the defendant's lack of a criminal history and recognized the defendant's dedication to his job and his country. The court noted that the evidence showed that the defendant could be rehabilitated and that there was a statistically low chance that he would reoffend. However, despite all this favorable evidence, the trial court still felt that "some confinement [was] necessary to avoid depreciating the serious nature of this offense and also to provide an effective deterrence to others likely to commit similar types of offenses." The court stressed that although the charge in this case was pled down to a Class E felony, thereby triggering the possibility of alternative sentencing, "the serious allegations involved in the case . . . would constitute a . . . [Class] 'B' felony, which indicates that the legislature has seen fit to make the allegations of this particular type of a crime, a serious offense." For these reasons, the trial court sentenced the defendant to ninety days of confinement. The transcript of the sentencing hearing indicates that the trial court considered the circumstances of the offense, the defendant's character and credibility, the best interests of the defendant and society, the value of deterrence, and the seriousness of the offense. After weighing these factors, the trial court determined that the defendant was not entitled to full probation. Although the record would support a granting of total probation, based upon our *de novo* review of the trial court's ruling, we cannot conclude that the court erred in ordering that the defendant serve ninety days in confinement, with the remainder of his sentence to be probated.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

ALAN E. GLENN, JUDGE

-15-